UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CHRISTOPHER REESE-THOMAS,

              Petitioner,

    - against -

UNITED STATES OF AMERICA,

              Respondent.

MEMORANDUM
AND ORDER
05-CV-2406 (JG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

A P P E A R A N C E S :

        LAW OFFICES OF SAGHIR
              111 Livingston Street
              Brooklyn, New York 11201
        By:   Uzmah Saghir
              Attorneys for Petitioner

        BENTON J. CAMPBELL
              United States Attorney
              Eastern District of New York
              271 Cadman Plaza East
              Brooklyn, New York 11201
        By:   Todd Harrison
              Attorney for Respondent

JOHN GLEESON, United States District Judge:

       Christopher Reese-Thomas moves, pursuant to 28 U.S.C. § 2255, to vacate his

conviction for multiple counts of fraud and his 115-month prison sentence. For the reasons set

forth below, the motion is denied.

BACKGROUND

A.    *The Crimes and the Charges*

In July 1999, the Federal Bureau of Investigation ("FBI") was advised of a scheme to defraud MoneyGram Payment Systems, Inc. ("MoneyGram"), a company engaged in money transfer services to individuals in the United States and elsewhere.  MoneyGram has a network of 26,000 authorized agents through which its customers can send and receive money payments.

The MoneyGram agent who takes in funds for transfer is referred to here as the sending agent; the one from whom the transferred funds are received by the intended recipient of the funds is referred to as the receiving agent.  When a sending agent takes in money for transfer from a sender, the agent contacts the company's operations center in Lakewood, Colorado, and provides the sending agent's unique personal identification number ("PIN") as well as the details of the sender's request (*i.e.*, amount, identity of recipient, etc.).  A reference number for the transaction is provided by the operations center, which the sending agent gives to the sender, who in turn gives it to the intended recipient.  The reference number, together with proof of identity, permits the recipient to retrieve the transferred funds from the receiving MoneyGram agent.

The operations center confirms orders over a certain amount by immediately calling back the sending agent after an order is placed.  Using the telephone number it has in its records, the operations center calls that agent, asks for the agent's PIN, and then confirms that the agent actually obtained the funds that are the subject of the requested transfer.

Reese-Thomas's scheme to defraud worked as follows:  First, he or a co-conspirator he recruited[1] would telephone MoneyGram agents (many of them corner stores or other small businesses) pretending to be from the operations center.  He would trick the agents into divulging their PINs.  Once he had an agent's PIN, the fraudster would call the telephone company, pretending to be that agent, and request that the telephone company forward all incoming calls to one of the multiple cellular telephones controlled by Reese-Thomas.

Then Reese-Thomas or one of his underlings would call the operations center, pretending to be a sending agent, and say he had just received a large sum of money to transfer to a specified recipient.  He would provide the PIN number of the MoneyGram agent he was impersonating.  After the transfer order was placed, the operations center would call back what it believed was the sending agent, but due to the call forwarding it would get one of the fraudsters instead.  The fraudster would of course falsely confirm receipt of the money.  The designated recipient, also a co-conspirator, would then go to a receiving MoneyGram agent, provide the requisite information and reference number, and be given the cash.  The victimized MoneyGram sending agents would discover after getting their telephones unforwarded (many were mystified -- and some delighted -- by the sudden cessation of calls from their spouses) that they owed large sums of money to MoneyGram.

A total of 145 such transfers occurred in this fraudulent fashion between June 1999 and January 2000.  Approximately $200,000 in cash was actually received by Reese-

---

[1]    Reese-Thomas recruited, among others, Muriel Cherry and Terence Smith to help place telephone calls and also to act as receivers of the fraudulent money transfers.  Smith pled guilty and was sentenced principally to four years of probation.  Cherry was convicted after a jury trial before me; she was sentenced principally to one year and one day of imprisonment and three years of supervised release.

Thomas and his underlings; additional transfers amounting to approximately $200,000 were not completed because the conspirators did not pick up the money from the receiving agents.

Reese-Thomas was under federal supervision during the relevant period, based on one of his numerous other fraud convictions. He falsely withheld from his supervising officer the various cellular telephone numbers he used to commit the MoneyGram fraud, and he gave false and misleading testimony under oath on that subject during a violation proceeding in that case in early 2000.

On April 11, 2002, Reese-Thomas (under the name Christopher Thomas, a/k/a "Christopher Reese" and "Black"), was charged in an indictment with conspiring to commit wire fraud (Count One) and nine counts of wire fraud (Counts Two through Ten).

B.      *The Plea Bargaining and Plea*

On May 10, 2002, the government sent a proposed plea agreement to defense counsel, John H. Jacobs. Reese-Thomas received it on May 17, 2002 and discussed it with Jacobs. At Reese-Thomas's instruction, Jacobs wrote to the prosecutor to convey three objections to the estimated Guidelines calculation set forth in the proposed plea agreement. Defense counsel wrote as follows:

> Our first objection is the increase of two points for sophisticated means. It is our position that there was nothing elaborate or sophisticated.
>
> The second objection is the enhancement for aggravated role, which we believe should be at most two points. In essence, there are not more than five participants in this case. I can elaborate on this when we speak.
>
> Third, the government seeks to enhance the offense

> level based upon transactions that were never received by the
> defendant.  If the government persists in this theory, a three level
> reduction for an incomplete crime should be considered.
>
> Let me know your thinking on the points.

Letter from John Jacobs to Adam Schuman, May 28, 2002.

On July 15, 2002, Reese-Thomas appeared before Judge Reena Raggi for the purpose of entering a guilty plea.  Instead, Reese-Thomas requested that Judge Raggi recuse herself from the case.  When Judge Raggi denied that application, Reese-Thomas refused to enter a guilty plea, and the case was set for trial.  Later that day the government notified Reese-Thomas by letter that it was withdrawing its plea offer.  Two days later, Reese-Thomas again moved for recusal, this time in writing, an application Judge Raggi denied in an endorsement order dated July 24, 2002.  Reese-Thomas subsequently pled guilty to the indictment (with the exception of Count Seven) on August 16, 2002.

C.     *The Sentence and the Direct Appeal*

On June 19, 2003, I sentenced Reese-Thomas principally to a 115-month term of imprisonment, to be followed by a three-year term of supervised release.[2]  Judgment was entered on June 27, 2003.

Reese-Thomas appealed.  As discussed below, he was initially represented on appeal by Jacobs.  However, Jacobs was subsequently relieved, and in the brief filed by his successor counsel, Reese-Thomas claimed that his Sixth Amendment right to counsel may have been violated because Jacobs may have been under investigation by the United States Attorney's

---

[2]     On March 7, 2003, after Judge Raggi's appointment to the United States Court of Appeals for the Second Circuit, the case was reassigned to me.

Office during the course of his representation of Reese-Thomas. In a supplemental *pro se* brief, Reese-Thomas claimed that there was an insufficient factual basis for his guilty plea, that the plea was involuntary, that this Court misapplied the Sentencing Guidelines in fashioning Reese-Thomas's sentence, and that the restitution order should be vacated because the amount of restitution exceeded the amount of loss to the victim.

On October 31, 2006, the Second Circuit affirmed the judgment of conviction and remanded the case for consideration of whether resentencing is warranted, pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).[3] *See United States v. Thomas*, 202 F. App'x 531, 535 (2d Cir. 2006). The court of appeals relegated the claim that Jacobs suffered from a conflict of interest to this § 2255 proceeding. As for the other claims on appeal, the court rejected Reese-Thomas's claim that he was denied the right to make a statement at sentencing; rejected the claim that it was error to deny him credit for accepting responsibility; found that there was indeed a factual basis for the plea of guilty and that the plea was voluntary; upheld the aggravating role adjustment; upheld the finding that Reese-Thomas made false statements in his sentencing letter to the Court; and upheld the restitution award. *Thomas*, 202 F. App'x at 533-35. The sentencing argument related to U.S. Sentencing Guidelines Manual § 2X1.1 (*i.e.*, the third objection set forth in letter quoted on page 4 above) was also left for resolution in this § 2255 petition, as appellate counsel for Reese-Thomas contended that Jacobs may have abandoned the claim to curry favor with the prosecutors.

---

[3] In an order filed today in the criminal case, I have declined to schedule a resentencing.

D.      *Jacobs's Potential Conflict of Interest*

Reese-Thomas filed his notice of appeal on November 5, 2003.  More than nine months later, in the midst of the briefing schedule of the appeal, and while Jacobs still represented Reese-Thomas, the government filed a request in the court of appeals for a conflict-of-interest hearing pursuant to *United States v. Curcio*, 680 F.2d 881, 890-91 (2d Cir. 1982).  The reason for the request was stated by Assistant United States Attorney Todd Harrison as follows:  "In recent months, Mr. Jacobs has come under investigation by this Office in connection with possible violations of federal criminal law that are unrelated to the defendant-appellant's case.  Mr. Jacobs has been informed of the existence of this investigation, which is continuing."  Harrison Decl. ¶ 3, Aug. 18, 2004.  The government sought a *Curcio* hearing to determine whether Reese-Thomas wanted to continue with Jacobs as his attorney on appeal despite the potential conflict of interest those circumstances created.  It suggested to the court of appeals that I could conduct the hearing in aid of the pending appeal.

The court of appeals approved, so Reese-Thomas, Jacobs and the prosecutor appeared before me for the *Curcio* hearing on September 15, 2005.  I explained the nature of Jacobs's conflict to Reese-Thomas.  He said he could not decide whether to waive his right; as Reese-Thomas himself put it in a letter to the Court dated September 22, 2004:  "I was unable to make a determination as to whether it was in my best interest to waive, or not to waive, conflict-free counsel."  Pet'r's Letter 1, Sep. 22, 2004.  To assist Reese-Thomas, I appointed separate counsel to advise him solely with respect to that issue, and adjourned the hearing to September 27, 2004.  Frank Geoly, Esq., was appointed pursuant to the Criminal Justice Act, and Reese-

Thomas reports he consulted with Geoly the following day.

Reese-Thomas's September 22 letter sought a further adjournment. He needed an additional opportunity to consult with Geoly about the case. "It may very well be the case that Mr. Jacobs failed to brief certain arguments" to prevent the government from pursuing him in a "more vigorous manner," Reese-Thomas wrote, contending that Geoly needed more time and "sufficient documentation" to advise Reese-Thomas on his options. *Id.* I granted an adjournment to October 13, 2004.

On that date, Reese-Thomas again requested more time, but for a different reason. The new reason was a desire to await the Supreme Court's decision in *Blakely v. Washington*, which would have a bearing on Reese-Thomas's sentencing arguments. *Curcio* Hr'g Tr. 3, 4-5, Oct. 13, 2004.[4] Reese-Thomas thus asked to "put it [*i.e.*, the *Curcio* waiver] over for a few weeks" so the appeal could be fully briefed. *Id.* at 5.

The following day I issued an order stating in relevant part as follows:

> I conclude that no further adjournments will be useful. I believe (and hereby find) that Thomas is simply stringing the issue along, hopeful that it may somehow work to his advantage in the current appeal or in some future challenge to his convictions. In the meantime, the briefing schedule in the court of appeals is apparently nearing an end.
>
> As the case is on appeal, removing current counsel and appointing new counsel is not my province. However, I respectfully recommend to the Court of Appeal that it relieve Jacobs, appoint new counsel for Thomas and permit new counsel

---

[4]     *Blakely* was decided on June 24, 2004, several months *before* the October 13, 2004 conference. *Blakely v. Washington*, 542 U.S. 296 (2004). As my order dated October 14, 2004 made clear, Reese-Thomas and his counsel were referring not to a need to await *Blakely* itself, but rather to await the outcome of two cases that had been argued days earlier in the Supreme Court, which would apply the Sixth Amendment rule of *Blakely* to the federal Guidelines. Those cases were decided in January 2005. *United States v. Booker* 543 U.S. 220 (2005).

to supplement, if he or she wishes to do so, any briefs filed by
Jacobs.

              The Clerk is directed to forward a copy of this order
to the court of appeals.

*United States v. Thomas*, 02-CR-441 (JG) (E.D.N.Y. Oct. 14, 2004).

        In an order dated January 25, 2005, the court of appeals vacated that order and

remanded the case for a *Curcio* hearing. *United States v. Thomas*, No. 03-1603-CR (2d Cir. Jan.

25, 2005). Its order indicates that it was unaware that a *Curcio* hearing was indeed conducted at

the October 13, 2004 appearance before me. *Id*. at 2-3 ("The District Court docket sheet reflects

that an otherwise undefined 'proceeding' was held on October 13, 2004 at which Thomas

apparently requested another adjournment.").

        I endeavored to comply with the January 25, 2005 order by scheduling another

*Curcio* hearing for February 9, 2005. However, Jacobs wrote to the Court on February 4, 2005

to report that he was afflicted with a late-stage terminal illness. Though he had applied to be

relieved by the court of appeals, it had denied the request. By order dated February 7, 2005, I

again recommended to the court of appeals that Jacobs be relieved from representing Reese-

Thomas in that court. The appearances noted on the court's October 31, 2006 decision of Reese-

Thomas's appeal indicate that the motion was granted and that Eileen F. Shapiro was appointed

to complete the appeal.

## DISCUSSION

A.     *The Ineffective Assistance Claim*

        Reese-Thomas has advanced a variety of challenges to his conviction and

sentence.  His principal contention is that Jacobs rendered ineffective assistance of counsel.

The Supreme Court has established the following standard for ineffective assistance claims:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Thus, to make out this type of claim, the petitioner must demonstrate both (1) that his attorney's performance "fell below an objective standard of reasonableness," *id*. at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.  In assessing the reasonableness of counsel's performance, judicial scrutiny "must be highly deferential," and the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (internal quotation marks omitted); *see also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*) ("[C]ounsel has wide latitude in deciding how best to represent a client . . . .").

In assessing counsel's performance, I "must conduct an objective review . . . measured for 'reasonableness under prevailing professional norms,' . . . which includes a

context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688-89)). The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct" and has instead emphasized that "'[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Id*. at 521 (quoting *Strickland*, 466 U.S. at 688).

To establish the requisite effect of counsel's performance on the outcome of the proceeding, it is not sufficient if the petitioner shows merely that counsel's errors had "some conceivable effect" on the outcome. *Strickland*, 466 U.S. at 693. Rather, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight. *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Reese-Thomas contends that Jacobs incorrectly informed him, prior to the July 15, 2002 court appearance at which Reese-Thomas asked Judge Raggi to recuse herself, that the government had withdrawn its offer of a plea bargain. Had Reese-Thomas known the offer was still available, the argument continues, he would have accepted it and pled guilty. I reject this claim for several reasons.

First, I find that Jacobs was not under investigation, let alone aware that he was under investigation, at the time he allegedly told Reese-Thomas that the plea offer had been

withdrawn.  The *Curcio* hearing I conducted related to the appeal, not the proceedings before me.  The record does not support Reese-Thomas's implicit claim that Jacobs was afflicted with a potential conflict of interest as early as June 2002.  To the contrary, the government represents that its investigation regarding Jacobs began only in October 2003, and Jacobs was informed of the investigation only in December 2003.  Harrison Aff. ¶ 2, Dec. 14, 2007.  Reese-Thomas admits that he does not "have any information to the contrary."  Pet'r's Letter, Dec. 10, 2007.  Accordingly, I conclude that Jacobs was not subject to any potential conflict of interest during the period leading up to Reese-Thomas's rejection of the government's plea offer.

Second, Reese-Thomas's claim makes no sense.  Even if Jacobs had an incentive to curry favor with the government in June 2002, it would hardly have induced him to *thwart* a plea agreement the government had proposed.  If Reese-Thomas were complaining that Jacobs had improperly *induced* him to plead guilty, the allegation would make sense -- at least if Jacobs were under investigation at the time, which he was not.  But acting in a manner that defeats a plea agreement the government offers in lieu of a trial is no way to curry favor with a prosecutor.

Third, I reject Reese-Thomas's claim that Jacobs told him in late June 2002 that the plea offer had been withdrawn.  Other than his own bare assertion, Reese-Thomas offers no evidence that Jacobs made such a statement to him.  And the other facts in the record cannot be squared with Reese-Thomas's claim.  As Reese-Thomas admits in his petition, prior to July 15, 2002 he received the plea offer, considered it with Jacobs and instructed him to convey three specific objections to the government's estimated Guidelines calculation.  Jacobs complied that direction in his letter dated May 28, 2002.  By rejecting the government's offer in this manner,

Reese-Thomas himself, not Jacobs, jettisoned the proposed plea agreement.

The minutes of the July 15, 2002 court appearance further undermine Reese-Thomas's version of events. He contends that in late June 2002 Jacobs told him the plea offer had been withdrawn, and that the only plea available to Reese-Thomas at the July 15, 2002 appearance was an "open plea," that is, a plea to the entire indictment. In fact, the prosecutor spoke of the plea offer at that conference as though it was still outstanding.[5] And later that day, after Reese-Thomas unsuccessfully sought Judge Raggi's recusal and declared his intention to go to trial, the government withdrew the offer in writing.

For many defendants, the foregoing sequence of events might not be so telling. But in Reese-Thomas's case, they are compelling. He has been, and remains, one of the most outspoken and prolific defendants I have come across. His countless *pro se* submissions over the years -- in his criminal cases and in this § 2255 case -- cover the widest possible range of topics. Reese-Thomas is intelligent and articulate, and he speaks his mind. If it were true that Jacobs falsely (not to mention inexplicably) told him in late June that the plea offer had been withdrawn, Reese-Thomas should have been quite surprised to hear the prosecutor speak of the offer as outstanding on July 15 and to learn that it was withdrawn in writing that same day. If, as Reese-Thomas now claims, he would have pled guilty on July 15 pursuant to the government's offered plea agreement if only he knew it remained open, it is inconceivable that he would have remained silent when it became clear to him that it was in fact open at that time. If Reese-Thomas is to be believed, the government's written withdrawal of the plea offer on July 15, 2002

---

[5]    *See* Status Conf. Tr. 2, July 15, 2002 ("A plea was extended on May 10 and we had understood over the past approximately month that Mr. Thomas was prepared to enter a plea and we were involved in just scheduling it. But we recently learned there may not be a plea . . . .").

proved that Jacobs had lied to Reese-Thomas just two or three weeks earlier about a matter of great importance to Reese-Thomas. Yet Reese-Thomas's next missive to Judge Raggi, a letter dated July 17, 2002, says nothing about that; rather, it once again sought her recusal on the ground that she could not be fair. And Reese-Thomas had two court appearances shortly thereafter, on July 26, 2002 and August 16, 2002. At neither of those appearances, nor in any of his numerous *pro se* motions and letters during that period, did he even hint, let alone allege, that he had not been properly informed of the state of the plea negotiations by defense counsel. To the contrary, at his guilty plea on August 16, 2002, Reese-Thomas specifically stated that he was satisfied with Jacobs's representation. *See* Plea Tr. 7, Aug. 16, 2002.

I find it appropriate to resolve this factual issue without the evidentiary hearing Reese-Thomas requests. I am mindful that 28 U.S.C. § 2255 provides that "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served on the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." However, the statutory requirement of a "hearing" is flexible and can be satisfied by means short of a full-fledged testimonial hearing. The Second Circuit's decision in *Chang v. United States*, 250 F.3d 79 (2d Cir. 2001), is illustrative. In that case, the defendant claimed in his § 2255 motion that his defense lawyer, in off-the-record conversations, forbade him from testifying at trial. *Id*. at 81. The district court solicited an affidavit from Chang's trial counsel but denied the motion without holding an evidentiary hearing, and Chang appealed. *Id*. at 81-82. The court of appeals held that for claims of constitutional ineffective assistance of

14

counsel, where the gravamen of the complaint, though "improbable," is not "so clearly bereft of merit as to be subject to dismissal on its face," and concerns "off-the-record interactions" that cannot be readily disproven by looking at the record, some type of "hearing" is required. *Chang*, 250 F.3d at 85. However, the detailed affidavit submitted by Chang's trial counsel was credible enough that it, together with the record, satisfied this flexible "hearing" requirement. *Id.* at 85-86; *see also id.* at 86 ("[T]he district court may use methods under Section 2255 to expand the record without conducting a full testimonial hearing." (citing *Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977))).

In affirming the district court's decision not to hold an evidentiary hearing, the court of appeals noted the advantages of this approach:

> It was, therefore, within the district court's discretion to choose a middle road that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing. The district court reasonably decided that the testimony of Chang and his trial counsel would add little or nothing to the written submissions. To be sure, the court did not have before it either the demeanor evidence or the cross-examination of counsel that would have resulted from a full testimonial hearing. Nevertheless, we cannot say that it was an abuse of discretion on the part of the district court to conclude that such a hearing would not offer any reasonable chance of altering its view of the facts.

*Chang*, 250 F.3d at 86.

Here, there is no affidavit from Jacobs,[6] but I still see no need to convene an evidentiary hearing at which Reese-Thomas can assert his claim about Jacobs. As discussed

---

[6] The government repeatedly asked Jacobs to submit an affidavit in response to the Reese-Thomas's § 2255 petition. But no such affidavit was filed. Unfortunately, Jacobs has since passed away.

15

above, all of the circumstances of the case impeach the claim that Jacobs informed Reese-Thomas that the government withdrew its offer, and Reese-Thomas does not contest that Jacobs was not under investigation at the time. Moreover, I am not required to ignore Reese-Thomas's rich history of fraud and deception. The conviction in this case was Reese-Thomas's eighth for fraud, larceny, theft or possession of stolen property. He has a comparably sordid track record as witness, as discussed at length in the government's letter dated May 28, 2003. There is no reasonable chance that hearing from Reese-Thomas will alter my view of the facts. An evidentiary hearing would pose a needless drain on the resources of the Bureau of Prisons, the Marshal Service and the Court, and would serve only to encourage other frivolous factual claims.

Another of Reese-Thomas's claims of ineffective assistance of counsel involves one of his numerous *pro se* sentencing submissions. Prior to sentencing, Reese-Thomas submitted a letter to the Court, dated February 28, 2003, in which he claimed that he had engaged in his sophisticated scheme to defraud MoneyGram for but one reason: to work off a debt he had incurred while being extorted by a local gang member. As the government pointed out in its response, the letter was obviously false. At the time of sentencing, this Court also found the letter to be false, *see* Sentencing Tr. 21-22, June 19, 2003, a finding that was subsequently affirmed on direct appeal. Neither Reese-Thomas nor Jacobs ever argued that the letter was, in fact, truthful. Instead, both of them attempted to withdraw the letter and requested that the Court disregard it. *Id*. at 5-6, 12, 14-15, 18-19. Reese-Thomas now makes the following contradictory claims: (1) there was no evidence that the letter contained false statements; but, (2) even though the letter was not false, his counsel was ineffective in failing to object to the Court's

consideration of the letter.

I am unpersuaded.  Reese-Thomas submitted the *pro se* letter to the Court on his own, without consulting his attorney.  After the government alerted the Court to the false allegations in the letter, Reese-Thomas, rather than contesting the government's characterization of the letter as false, attempted to withdraw the letter.  Subsequently, both Jacobs and Reese-Thomas attempted to persuade the Court to allow the withdrawal of the letter and to not consider the letter's contents at sentencing.  (At no time did Reese-Thomas assert that the letter was truthful.)  In short, Jacobs tried to protect Reese-Thomas from himself by urging the Court to disregard the letter.  There is no basis for Reese-Thomas's claim that Jacobs's representation fell below prevailing professional norms.

The claim that Jacobs was ineffective in not objecting to the amount of the restitution order is equally meritless.  The presentence report fixed the restitution owed to MoneyGram at $200,000.  Reese-Thomas's argument in this regard is based solely on the Assistant United States Attorney's representation to Judge Raggi when discussing the § 2X1.1 issue that the precise amount of money picked up from MoneyGram by Reese-Thomas and his coconspirators was "just slightly below $200,000."  Sentencing Tr. 20, Dec. 19, 2002.  The record does not reveal what "just slightly below" means, but since Reese-Thomas himself, in one of his innumerable *pro se* submissions, admitted that "the actual fraud was $200,000," Pet'r's Mem. to U.S.P.O. Suarez 2, Oct. 28, 2002 (appended to Addendum to Presentence Report), his lawyer can scarcely be criticized for not contesting the amount of the restitution order.

Accordingly, Jacobs's performance was not deficient, and I thus have no occasion

to consider the question of prejudice.[7]

B.  *Sentencing Issues*

    1.  *Criminal History Points*

    Reese-Thomas also contends that his sentence must be vacated because his

Sentencing Guidelines computation was based in part upon a 2001 conviction in the Southern

District of New York that was subsequently vacated.  That conviction, for access device fraud,

had resulted in a 41-month sentence imposed by Judge William H. Pauley, III.  Though it is true

that Judge Pauley vacated that conviction on April 25, 2005 and ordered a new trial, he

subsequently reconsidered on the government's motion, reinstating the conviction and undoing

the order vacating it.  *Thomas v. United States*, No. 02 Civ. 6254 (WHP) (S.D.N.Y. Sept. 1,

2005).  Accordingly, this challenge to the sentence imposed in this case must be rejected.

    2.  *The Fraud Loss Computation*

    The Second Circuit did not reach Reese-Thomas's claim that this Court overstated

the amount of loss in its Guidelines computation because some of the fraudulent MoneyGram

transfers were not completed, that is, Reese-Thomas and his co-conspirators never picked up the

money.  Appellate counsel had argued that Jacobs may have abandoned the claim to curry favor

with prosecutors.  In both of its manifestations, *i.e.*, the merits of the sentencing calculation and

the assertion that Jacobs somehow sabotaged the argument, this claim is frivolous.

    Section 2X1.1 of the United States Sentencing Guidelines provides for downward

adjustments of three levels for certain attempts and conspiracies unless the defendant completed

---

[7]    An additional claim of ineffective assistance by Jacobs, which relates to Reese-Thomas's fraud
loss computation, is discussed and rejected in section B.2, *infra*.

all the acts believed necessary to successfully complete the crime or would have done so but for being apprehended or interrupted by some other similar event beyond his or her control. *See* U.S. Sentencing Guidelines Manual § 2X1.1(b). The Sentencing Commission suggested in the background commentary to the section that these mitigating adjustments would be uncommon, as most conspiracy and attempt prosecutions involve crimes that were either substantially completed or interrupted on the verge of completion, thus disqualifying the defendant for relief under the guideline. *See* § 2X1.1 cmt. background; *see also United States v. Rosa*, 17 F.3d 1531, 1550-51 (2d Cir. 1994) (finding three-step reduction appropriate only where arrest occurs well before defendant or any co-conspirator has completed acts believed necessary to complete offense); *see generally* Gordon Mehler et al., *Federal Criminal Practice: A Second Circuit Handbook* § 42-22 (2006) (analyzing § 2X1.1).

These principles are of no help to Reese-Thomas. It is undisputed that there were $400,000 in fraudulent money transfer orders placed with MoneyGram. In order for those fraudulent transactions to occur, all of the steps described above -- inducing the victim agent to divulge his or her PIN; forwarding his or her phone; contacting the operations center to place the money transfer order; fielding the return call and pretending to be the victim agent -- had to occur. That there were problems with *picking up* half of the transfers does not alter the obvious fact that those transactions were on the verge of completion. Moreover, the government represented at the December 19, 2002 proceeding before Judge Raggi that it could prove through accomplice testimony at a hearing that the reason for the incomplete transactions were discovery of the fraud by MoneyGram agents and that Reese-Thomas had decided that the recipients'

"names were now . . . hot." Sentencing Tr. 18, Dec. 19, 2002. Defendants are not entitled to a

decrease in offense level under § 2X1.1 when the only impediment to the completion of the

crime was their eleventh-hour fear of getting caught. Thus, there is no basis to conclude that

Reese-Thomas had a viable sentencing argument under that provision.

As for Jacobs's effort on the issue, the record speaks for itself, and his efforts

were commendable. On December 19, 2002, after a full discussion of the crime, Judge Raggi

noted that (a) it was the defendant's burden to establish the basis for the reduction; (b) given the

loss quantity adjustments in the fraud guideline, perhaps as little as a single offense level was at

stake; and (c) there was significant peril to Reese-Thomas in litigating the matter. As Judge

Raggi summed up the issue:

> So unless the defendant is going to be able to show
> me the abandonment of more than $50,000 of this 400,000, I'm not
> sure the Court would even consider any § 2X1.1 adjustment. Even
> if he persuaded me that there were some adjustment, I'm not sure
> how much he would get. He realized over $200,000, that's 8, so at
> best here what are we talking about a point?
>
> I urge you to discuss this with Mr. Thomas because
> there is still this issue about his acceptance of responsibility and
> what many defendants don't realize, most of them are far smarter
> than Mr. Thomas, many defendants don't realize that if there is a
> hearing about other issues decided adversely to a defendant, it can,
> it doesn't have to but it can raise a question about acceptance of
> responsibility in general, not simply the three points but in general.

Sentencing Tr. 20, Dec. 19, 2002. Jacobs pressed the issue further but agreed to discuss Judge

Raggi's views with Reese-Thomas. *Id*. at 22. When the parties appeared for sentencing before

me on June 19, 2003, Jacobs confirmed that the § 2X1.1 issue had been taken "off the table" by

Reese-Thomas. Sentencing Tr. 19, June 19, 2003. In the circumstances, that can hardly be

characterized as anything other than sound professional judgment.

CONCLUSION

I have examined each of the numerous challenges by Reese-Thomas to his conviction and sentence, including those discussed above, and find them all to be without merit. Accordingly, his motion is denied. Because he has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.


So ordered.



JOHN GLEESON, U.S.D.J.



Dated: December 18, 2007
       Brooklyn, New York